## Case No. 3,974.

### The DOLPHIN.

[1 Flip. 592; 9 Chi. Leg. News, 337; 6 Ins. Law J. 528; 24 Pittsb. Leg. J. 187.][1]

Circuit Court, E. D. Michigan. 1876.[2]

MARINE INSURANCE — LIEN IN FAVOR OF UNDERWRITER — WHAT THE LIBEL SHOULD AVER.

[Appeal from the district court of the United States for the eastern district of Michigan.

[For opinion of the district court, see Case No. 3,973.]

W. A. Moore, C. E. Warner, and F. H. Canfield, for a number of libellants.

J. J. Atkinson, for insurance company.

SWAYNE, Circuit Justice. I have listened with great attention to the arguments submitted by counsel upon both sides of this case, and I have since read with care the opinion of my learned brother, the district judge. It is careful, able, learned, and well considered.

---

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 9 Chi. Leg. News, 337, and 24 Pittsb. Leg. J. 187, contain only partial reports.]

[2] [Affirming The Dolphin, Case No. 3,973.]

The profession and the courts are very much at sea as to many questions touching liens upon admiralty. Different district and circuit judges, and judges of the supreme court on the circuit are constantly deciding the same questions differently, all over the country where such questions arise. It has been expected confidently that congress would interpose, and by a law remedy all such doubts and difficulties. This has not yet been done, but it is hoped that it will be done at an early day. My first impulse was to take this case home with me and prepare an elaborate opinion, but reflection has brought me to a different conclusion. In such an opinion my brethren of the supreme court might not concur, and I have thought it best, therefore, to keep my mind, as far as it might be consistent with the performance of my duties, uninfluenced by the consideration of such cases, except as they may come before the full court. As regards this case, there are two obstacles in the way to a different conclusion than has been reached already. I should have decided the case in the same way, and as at present advised, I am willing to indorse and stand by Judge Brown's opinion. I am not prepared to say that he has committed any error; I think he has not.

The decree of the district court is affirmed.

NOTE. The meaning of this would seem to be that while the impressions of the judge were with the writer of the opinion in The Dolphin [Case No. 3,973], he reserved to himself the right to change, alter, or modify his own after argument of a case in the supreme court and consultation with his brother judges.

No one has a higher respect for the great learning and acute intellect of the district judge for the eastern district of Michigan, than the writer. Whatever has been said or written by this magistrate is justly entitled to the most respectful and thoughtful consideration. But the law is the science of reason and justice, and the humblest member of the profession has, as to any question, the right to enter a plea for the right, if he shall do so in a becoming manner.

The supreme court in Vandewater v. Mills, 19 How. [60 U. S.] 89, set their faces against the oft-recurring attempts to enlarge the limits of admiralty liens. They say, by Grier, J.: "The maritime privilege" or lien is adopted from the civil law, and imports a tacit hypothecation of the subject of it. It is a jus in re without actual possession or any right of possession. It accompanies the property into the hands of a bona fide purchaser. It can be executed and divested only by a proceeding in rem. This sort of proceeding against personal property is unknown to the common law, and is peculiar to the process of courts of admiralty. The foreign and other attachments of property in the state courts, though by analogy loosely termed proceedings in rem, are undoubtedly not within the category. But this privilege or lien, though adhering to the vessel is a secret one; it may operate to the prejudice of general creditors and purchasers without notice; it is therefore stricti juris, and cannot be extended by construction, analogy or inference. "Analogy," says Pardassus (3 Droit Civ. 597), "cannot afford a decisive argument, because privileges are of strict right. They are an exception to the rule by which all creditors have equal rights in the property of the debtor, and an exception should be declared and described in express

words. We cannot arrive at it by reasoning from one case to another." "These cases will be found stated, and fully vindicated in the case of The Young Mechanic [Case No. 18,180]; The Kearsarge [Id. 7.633]; and Harmer v. Bell. 22 Eng. Law & Eq. '62."

"Now," continues Judge Grier, at another place in the same opinion, "it is a doctrine not to be found in any treatise on maritime law, that every contract by the owner or master of a vessel, * * * hypothecates the vessel for its performance." Though stated in The Williams [Case No. 17,710] differently, viz., that all contracts including insurance, made by the master, bind the ship (Brown, Adm. 208), the learned district judge admits that this principle is in one particular incorrect. He says that the part referring to insurance is erroneous, because contracting for that is not within the province of the master—it rests with the owners. Here he is undoubtedly correct. And why has the master no such power? For the simple reason that he cannot bind the ship except for such supplies as are absolutely necessary to enable it to properly discharge its functions in commerce and navigation. He may, when he can raise money in no other way, hypothecate the ship on bottomry or borrow money by respondentia. He can charge the ship for all needful supplies and equipment, as seamen, wharfage, provisions, repairs, etc.; but they must all fall within the line of strict necessaries, for which the boat needs credit.

The reader, in the foregoing extract taken from Vandewater v. Mills, will notice how the court speak of deducing principles from analogy. They refer to that case again on page 91 of the opinion, paragraph 3. Now, in The Dolphin decision, an attempt is made to trace an analogy between the contract of affreightment and that of marine insurance. In the former the cargo is bound to the ship and the ship to the cargo. The contract is reciprocal. In the latter case, how are the insurers bound to the ship? The contract is made between the owners and the insurers, and not with the ship at all. In the admiralty it is well understood that the ship is one person and the owner or owners other and distinct persons. Moreover, the lien goes along hand in hand with the service, supply or benefit conferred on the vessel (Vandewater v. Mills, 19 How. [60 U. S. 89], and passim); and if it be admitted for the sake of argument that marine insurance is a supply, (wnich is not the case,) the benefit derived from supply must be immediate in order to draw along the lien. If any benefit can be derived from this so-called supply by the vessel, it cannot be immediate but is in futuro; for the benefit, if at all, must be in the payment of the premium, the contingency for which may, or may not happen.

If the vessel be a total loss, of what service would the premium, when collected by the owners, be to the wholly lost or ruined ship? The owners might or might not purchase or build another, but if they did there could be no notion of a lien connected therewith, for the additional reason that owners have no liens; only third parties. If the boat were partially injured, the owners might or might not repair, and to that the same argument might be added as in the case of total loss. Nor can it be a benefit or service of any kind to the vessel. There is another feature inseparably connected with liens on ships—that is, credit to the vessel. Here the credit is wholly to the owners, and if there be no credit to the vessel there is no lien. Even supplies furnished in a foreign port where the owner may happen to be at the time, or his agent, or where he has credits, or if the captain be supplied with funds, create no lien. It is for the furnisher to see that the vessel needs the credit, and it is for this reason that in the home port. where supplies are furnished or repairs made, there is no lien on the vessel because it is supposed that the owner has credit. There is an exception where it appears that he

is wholly insolvent, or a special contract has been made to charge the vessel. The law does not presume the credit; acts or facts must prove it.

The reasoning of the judge is almost wholly by analogy, and the grounds he bases his decision upon are: 1st—That, as the contract is maritime, therefore a lien follows; and 2d—It is a supply, and therefore is entitled to rank as a lien. As is well known there are contracts that are maritime which do not carry a lien with them. If you go to that question—or the one of supply—where can a better illustration be found than in the master of a ship? His contract with the owner for the sailing of the boat pertains to, and is to be performed upon, or in connection with, the sea or public watercourse, and strictly falls within commerce and navigation; hence it is a maritime contract. Yet he has no lien; no, not even for advances that he may make, or articles he may purchase as necessaries for the ship. This is the well settled law in England, and the weight of authorities is the same way in this country. See 2 Pars. Shipp. & Adm. p. 24. Why? Because he does not contract with the ship, but with the owners, and the articles he furnishes are supposed to be furnished upon the understanding either that he has money or credits of the owners, and that he does not in any case look to the ship, but solely to them; and, perhaps, also, another reason may operate to a certain extent. he is the general agent of the owners, and on board represents them. Go to the question of supply. Let it be answered, where is there a supply or service so necessary to a ship as the master of the vessel? He is as necessary, as much so, as seamen who have liens—as necessary as provisions or repairs. He is the eye, the life, the soul of the ship. It is he who directs her course through the sunshine as well as the storm, and without him the vessel could not fulfill its mission of moving upon the waters and plying in the marts of trade. And yet he has no lien. The judge seems to have overlooked the decision made by Mr. Justice Story—that great master of admiralty law—in De Lovio v. Boit [Case No. 3,776], a case decided in 1815. It was then ruled that the contract of insurance taken on a vessel was a maritime contract. And the other decision made by the same judge, reported in Hale v. Washington Ins. Co. [Id. 5,916], decided in 1842, in which he refers to the previous case and re-affirms the decision, remarking at the same time that he had wished to have the supreme court pass upon the question; that an opportunity was on one occasion about to be offered, and he believed, had not the case been dismissed, that his brother judges, Marshall and Washington, would have expressed themselves in accordance with his views. Here then for sixty years previous to the 11th Wallace case the law was so ruled. Is it not to be supposed that it was well understood by the profession, and for that reason acquiesced in rather than that the question was new and admitted of considerable doubt? Moreover, the proceeding in Insurance Co. v. Dunham [11 Wall. (78 U. S.) 1] was in personam, not in rem. Does any one doubt that the master of a ship may proceed likewise in personam in a court of admiralty for wages and advances? The analogy would seem to hold good between his case and that of a marine policy—both being maritime contracts and neither having liens, and the contract in each case being with the owners. Hammond v. Essex Fire & Marine Ins. Co. [Case No. 6,001]; Willard v. Dorr [Id. 17,679].

Let this be said: The decision in the John T. Moore [Case No. 7,430], decided by one of the present associate justices of the supreme court (then circuit judge), seems to rest alone upon true grounds—the policy is taken out for the benefit and indemnity of the owner, and is of no service or benefit to the vessel. However ingenious the argument, the judge has failed to show that the continental law of Europe sup-

ports his view. The ordinance of Louis XIV. does not recognize a lien in marine insurance, and however fine-spun the reasoning of those great men, Valin and Emerigon, may be, the fact is patent from the opinion that the authority for the principle announced in it is derived from the Code of Commerce of France, a merely local law, which binds no other nation. That law is very different from ours. There marine insurance is ranked as a lien in the scale as No. 10, only one other lien being lower. There the master of a vessel takes No. 6 as his lien-rank, four degrees above the insurer, while (as heretofore shown) in our law he has no lien at all. Moreover, it is not stated in the opinion, as the writer understands the fact to be and as is the law in Louisiana, that the "privilege" in the French law is to be recorded, so that the liens are not as ours, secret, but known to all the world. And if not recorded, it is for the reason that the contract is acknowledged before, and authenticated by, a notary, and there is as much publicity in this as an acknowledgment or other act done in our courts of record; for it is a well known fact that, in all ports in countries where the civil law holds sway, during business hours the offices of the notaries are filled with brokers, ship owners, lawyers, merchants and others. The contract when it leaves the notary's hand in France is termed the acte, and in no sense can be considered secret. These actes are official, and executed in a public manner.

Taking this to be so, the French law is certainly not so objectionable, because no one would be so readily prejudiced thereby. The great objection to liens under our system is—they are secret and prejudice general creditors. How unjust that the insurer, who has rendered the vessel no service, should step in ahead of the master, who has given his time, his money, and exposed his life in behalf of the ship; and of the builder, who has no lien (Roach v. Chapman, 22 How. [63 U. S.] 129), neither one of whom, as general creditors, in all probability will receive a dollar of the proceeds. Secret liens injure commerce, for reasons apparent to every one, and our policy has been to fetter navigation and trade as little as possible. No doubt this is the reason why the greatest commercial nation of ancient or modern times—England—has never accepted or declared the doctrine of lien in such case—that nation which may be almost literally said to have a ship in every port, bay, harbor and navigable river in the world, for wherever men live, whether civilized or savage, off their coasts may be seen the flag of St. George floating in the breeze.

How far, or whether to any extent, her policy has been adopted on the continent of Europe, the writer is not prepared to say. He has a copy of the Italian Codice Civile, with the royal imprint, A Torino (Turin), but finds no such title as "Assicurazione" (insurance) in it. He regrets not being able to lay his hand upon the Codigo de Comercio of Spain, and the works of her writers on this branch of the law. It appears that marine insurance took its origin at Barcelona, and it is possible that this subject has been thoroughly discussed. Nor has he been able to ascertain the law in the Baltic provinces and German empire, or of other portions of Europe. Is it necessary? The supreme court of the United States, in The Lottawana Case, 21 Wall. [88 U. S.] 577. have laid down the following rule for our guidance. They say:

"Perhaps the maritime law is more uniformly followed by the commercial nations than the civil and common laws are by those who use them. But like those laws, however fixed, definite, and beneficial the theoretical code of maritime law may be, it can have only so far the effect of law in any country as it is permitted to have. But the actual maritime law can hardly be said to have a fixed and definite form as to all the subjects which may be embraced within its scope. Whilst it is true that the great mass of maritime law is the same in all commercial countries, yet in each country peculiari-ties exist either as to some of the rules, or in the mode of enforcing them. * * * No one doubts that every nation may adopt its own maritime code. France may adopt one, England another, the United States a third; still the convenience of the commercial world, bound together as it is by mutual relations of trade and intercourse, demands that in all essential things wherein those relations bring them in contact there should be a uniform law founded on natural reason and justice. Hence, the adoption by all commercial nations (our own included) of the general maritime law as the basis and groundwork of all their maritime regulations. But no nation regards itself as precluded from making occasional modifications suited to its locality and the genius of its own people and institutions, especially in matters that are of merely local and municipal consequence, and do not affect other nations. * * * Each state adopts the maritime law, not as a code having any independent or inherent force proprio vigore, but as its own law, with such modifications and qualifications as it sees fit. Thus adopted and thus qualified in each case, it becomes the maritime law of the particular nation that adopts it. And without such voluntary adoption it would not be the law. And thus it happens that from the general practice of commercial nations in making the same general law the basis and groundwork of their respective maritime systems, the great mass of maritime law which is thus received by these nations in common comes to be the common maritime law of the world. * * * The question as to the true limits of maritime law and admiralty jurisdiction is, undoubtedly, as Chief Justice Taney intimates, exclusively a judicial question, and no state law or act of congress can make it broader, or, it may be added, narrower than the judicial power may determine those limits to be. But what the law is within those limits, assuming the general maritime law to be the basis of the system, depends on what has been received as law in the maritime usages of this country, and on such legislation as may have been competent to affect it. To ascertain, therefore, what the maritime law of this country is, it is not enough to read the French, German, Italian, and other foreign works on the subject, or the codes which they have framed, but we must have regard to our own legal history, constitution, legislations, usages, and adjudications as well. The decisions of this court illustrative of these sources, and giving construction to the laws and constitution, are especially to be considered; and when these fail us, we must resort to the principles by which they have been governed. But we must always remember that the court cannot make the law; it can only declare it. If within its proper scope any change is desired in its rules other than those of procedure, it must be made by the legislative department."

On maritime contracts, see De Lovio v. Boit [Case No. 3.776]; Hale v. Washington Ins. Co. [Id. 5,916]; on analogy in maritime liens, Vandewater v. Mills, 19 How. [60 U. S.] 89, 91; on secret liens, same authority, and Steele v. Franklin Ins. Co., 17 Pa. St. 290; Turner v. Stetts, 28 Ala. 420; Stilwell v. Staples, 19 N. Y. 401; and 2 Cush. 412.